IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARGARET ASH, et. al.              Case No. 15-cv-149-pp

                    Plaintiffs,

v.

CAROLYN W. COLVIN,

                    Defendant.

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S
MOTION TO DISMISS (DKT. NO. 19), DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION (DKT. NO. 13), STAYING PLAINTIFFS' MOTION
TO CERTIFY CLASS (DKT. NO. 9), AND GRANTING PLAINTIFFS' MOTION
TO FOR LEAVE TO AMEND THE COMPLAINT (DKT. NO. 29)**

On February 5, 2015, thirty-five plaintiffs filed a complaint against

Carolyn W. Colvin, the Acting Commissioner of the Social Security

Administration ("SSA"), alleging that she violated the plaintiffs' "due process in

the conduct of adult disability hearings in Indiana, Illinois and Wisconsin as it

relates to vocational testimony." Dkt. No. 1. The plaintiffs ask the court to

determine whether the Commissioner has "a clandestine policy of denying fair

disability hearings in violation of the Social Security Act, the Administrative

Procedure Act, and the Due Process Clause of the Fifth Amendment." Id. at

¶63. Specifically, the plaintiffs challenge an alleged policy of denying claimants'

requests that vocational experts produce the evidence that supports their

testimony and conclusions provided at the administrative hearing.

1

On March 17, 2015, the plaintiffs filed a motion to certify class under Fed. R. Civ. P. 23(b)(2), Dkt. No. 9, and a combined motion for preliminary injunction and expedited discovery, Dkt. No. 13. On April 17, 2015, the Commissioner filed a motion to dismiss. Dkt. No. 19. On December 8, 2015, the plaintiffs filed a motion to amend the complaint. Dkt. No. 29. The parties have fully briefed the motions.

## I.  BACKGROUND

Because of the nature of this suit, the court will provide an overview of the Social Security administrative process, including a history of recent case law addressing vocational expert testimony at the administrative hearing.

### A.  Social Security "Disability" Defined

The SSA provides "disability insurance benefits and supplemental security income to persons who have a 'disability.'" Barnhart v. Thomas, 540 U.S. 20, 21-22 (2003) (citing 42 U.S.C. §§423(d)(2)(A), 1382c(a)(3)(B)). To qualify as "disabled," the claimant must demonstrate a "physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. The Social Security Act further "defines 'disability' as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. at 23.

2

B.   The Administrative Process

When applying for Social Security benefits, claimants face a complex administrative review process. 20 C.F.R. §404.900. First, the claimant receives an initial determination. If that determination is unfavorable, the claimant may request that the SSA reconsider the decision. If the claimant is dissatisfied with the reconsideration, the claimant then may request a hearing before an administrative law judge ("ALJ"). If the claimant is not satisfied with the ALJ's decision, the claimant "may request that the Appeals Council review the decision." 20 C.F.R. §404.900(a)(1)-(5). If claimant has completed steps one through four, the fifth step is for the claimant to "request judicial review by filing an action in a Federal district court." Id.

C.   The Administrative Hearing

In evaluating a claim for disability benefits, the ALJ follows a five-step, sequential process, asking:

> (1) Has the claimant engaged in substantial gainful activity since his alleged onset of disability?
>
> (2) If not, does he suffer from a severe, medically determinable impairment?
>
> (3) If so, does that impairment meet or equal any impairment listed in SSA regulations as presumptively disabling?
>
> (4) If not, does he retain the residual functional capacity ("RFC") to perform his past work?
>
> (5) If not, can he perform other jobs existing in significant numbers?

E.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).

If it appears at any step that the claimant is or is not disabled, the analysis ends. 20 C.F.R. §404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

      1.    *Resources Used by ALJs at Step Five*

At step five in the disability determination process, the ALJ determines whether the claimant can perform other jobs existing in significant numbers in the national economy. 20 C.F.R. §404.1520(a)(4)(v). When the ALJ determines what "jobs exist in the national economy (in significant numbers either in the region where [the claimant lives] or in several regions of the country)," the ALJ "take[s] administrative notice of reliable job information available from various government and other publications." 20 C.F.R. §404.1566(d). The regulations provide a non-exhaustive list of publications on which the ALJ may rely at step five:

> (1) Dictionary of Occupational Titles, published by the Department of Labor;
>
> (2) County Business Patterns, published by the Bureau of the Census;
>
> (3) Census Reports, also published by the Bureau of the Census;
>
> (4) Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and
>
> (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics.

4

20 C.F.R. §404.1566(d)(1)-(5). The ALJ may employ a vocational expert "[i]f the issue in determining whether [the claimant is disabled] is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue." 20 C.F.R. §404.1566(e).

At step five, "ALJs often rely heavily on two sources . . . to determine whether the government has met its burden: the [*Dictionary of Occupational Titles*] and Vocational Experts." <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011). The Department of Labor publishes the *Dictionary of Occupational Titles* (DOT), and it "provides standardized occupational information, including the most typical characteristics of jobs as they exist throughout the American economy." <u>Id.</u> "It classifies jobs based on a number of factors, such as worker actions, exertional level and skill requirements in order to facilitate the placement of applicants in positions that match their qualifications." <u>Id.</u> Federal regulations require ALJs "to take administrative notice of the DOT." <u>Id.</u> (citing 20 C.F.R. §404.1566(d)(1); 20 C.F.R. §416.966(d)(1)).

In addition to the DOT, ALJs rely on vocational experts ("VEs"), who "supplement the information provided in the DOT by providing an impartial assessment of the types of occupations in which claimants can work and the availability of positions in such occupations." <u>Id.</u> (citing <u>Liskowitz v. Astrue</u>, 559 F.3d 736, 743 (7th Cir. 2009)). ALJs have the discretion to employ VEs at administrative hearings. If the ALJ decides to use a VE, "he must make sure that the testimony comports with the rules set forth in the Commissioner's Social Security Rulings." <u>Id.</u>

Social Security Ruling 96-9p allows for the use of VEs in complex cases. The ruling defines "vocational expert" as a "professional[] who provide[s] impartial expert opinion during the hearings and appeals process either by testifying or by providing written responses to interrogatories." Id. at n.8. The court may use a VE "before, during or after a hearing," but whenever the court uses a VE, the claimant "has the right to review and respond to the VE evidence prior to the issuance of the decision," and "[t]he VE's opinion is not binding on an adjudicator, but must be weighed along with all other evidence." Id. Parties may ask the VE to produce

> [a]ny or all of the following: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy.

Id.

### 2. *Inconsistencies Between the DOT and VE Testimony*

Vocational experts often rely on the Department of Labor's *Dictionary of Occupational Titles*, but "[c]ourts disagree about the appropriate interaction between the *Dictionary* and a vocational expert." Donahue v. Barnhart, 279 F.3d 441, 444-45 (7th Cir. 2002). Sometimes the DOT and the VE testimony conflict, and some claimants have limited access to the materials the VEs use to support his or her testimony.

6

a. Access to VE Testimony: The "Available on Demand" Rule

In <u>Britton v. Astrue</u>, 521 F.3d 799, 803 (7th Cir. 2008), the Seventh Circuit addressed whether a claimant should "have had more access to the VE's data." The claimant argued "that the Commissioner failed to satisfy his step-five burden of 'providing evidence' demonstrating that other work the claimant can perform 'exists in significant numbers in the national economy.'" <u>Id.</u> (quoting 20 C.F.R. §404.1560(c)(2) and citing <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005)). The Seventh Circuit noted:

> When the Commissioner satisfies this burden through expert testimony from a VE, that testimony must be reliable. A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated. We have held that any data or reasoning underlying the VE's bottom line must be *available on demand* so that the claimant may test the reliability of the VE's testimony.

<u>Id.</u> (emphasis added, internal quotation marks and citations omitted). In <u>McKinnie v. Barnhart</u>, 368 F.3d 907 (7th Cir. 2004), the Seventh Circuit held that such evidence is not "available on demand" when the ALJ asks the claimant to pay the VE for the production of the evidence or for a report supporting the VE's testimony. In <u>Britton</u>, the VE "brought substantial . . . materials with her to the hearing and was willing to provide a selection—those portions on which she relied—to" the claimant. <u>Britton</u>, 521 F.3d at 804. On the record, at the ALJ hearing, the claimant's attorney rejected the offer. The court found that this satisfied the "available on demand" requirement.

7

The Seventh Circuit didn't stop with that finding, however. Instead, they closed <u>Britton</u> by addressing "the lack of pretrial discovery in Social Security hearings" which "can make the task of cross-examining a VE quite difficult." <u>Id.</u> The Seventh Circuit promulgated the "available on demand" rule in order "to facilitate cross-examination and testing of the VE's reliability." <u>Id.</u> The court emphatically declared, "[W]e refuse to endorse a system that drags out every Social Security hearing to an interminable length." <u>Id.</u> The court then "encourage[d] ALJs and the Social Security bar to cooperate in such a way that makes data underlying VE testimony available on demand without making every hearing impossibly long." <u>Id.</u> What does that mean? The court provided some examples: "Perhaps brief recesses should be provided so attorneys can examine the sources relied upon by VEs," or "the claimant's attorney should have access to copies of the pages of those sources on which the VE relied," or "an attorney who wants to make an argument based on data unavailable at the hearing should have the opportunity to do so by supplementing the record after the hearing." <u>Id.</u> These "suggestions" should "achieve the proper balance between the needs of the claimant to effectively cross-examine the VE and the needs of the Commissioner to hold efficient hearings." <u>Id.</u>

        b.     Social Security Rulings: ALJs Must Probe and Resolve Inconsistencies

Social Security Ruling 00-4p "clarifies" the Social Security Administration's "standards for use of vocational experts (VEs) who provide evidence at hearings before administrative law judges . . . and other reliable

8

sources of occupational information in evaluation of disability claims." SSR 00-

4p. Specifically, the ruling requires

> that before relying on VE . . . evidence to support a
> disability determination or decision, our adjudicators
> must:
>
> - Identify and obtain a reasonable explanation for
>   any conflicts between occupational evidence
>   provided by VEs . . . and information in the
>   *Dictionary of Occupational Titles* (DOT), including
>   its companion publication, the *Selected
>   Characteristics of Occupations Defined in the
>   Revised Dictionary of Occupational Titles* (SCO),
>   published by the Department of Labor, and
>
> - Explain in the determination or decision how
>   any conflict that has been identified was
>   resolved.

Id. The SSA acknowledged that "[i]n making disability determinations, we rely

primarily on the DOT . . . for information about the requirements of work in the

national economy," and that it "most often use[s] VEs to provide evidence at a

hearing before an ALJ." Id.

Ruling 00-4p provides that any "evidence provided by a VE generally

should be consistent with . . . the DOT," *but it places a duty on the ALJ*, "[a]t

the hearings level . . . to fully develop the record," which includes an inquiry

"on the record, as to whether or not there is such consistency." Id. If the ALJ

determines that an inconsistency exists, the SSA does not provide a preference

between the DOT and the testimony of a VE: "Neither . . . automatically

'trumps' when there is a conflict." Id. *The ALJ has a duty* to "resolve the conflict

by determining if the explanation given by the VE . . . is reasonable and

9

provides a basis for relying on the VE . . . rather than on the DOT information." Id.

Repeatedly, Ruling 00-4p places a duty *on the ALJ* "to ask about any possible conflict between the VE . . . and information provided in the DOT," when such evidence relates to "the requirements of a job or occupation." Id. Specifically, the ALJ "will [a]sk the VE . . . if the evidence he or she has provided conflicts with the information provided in the DOT," and, "[i]f the VE's evidence appears to conflict with the DOT, *the adjudicator* will obtain a reasonable explanation for the apparent conflict." Id. (emphasis added). "When the vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . to support a determination . . . that the individual is or is not disabled." Id. Specifically, the ruling requires the ALJ to "explain in the determination or decision how he or she resolved the conflict," and the ALJ "must explain the resolution of the conflict irrespective of how the conflict was identified." Id.

3.   *District Court and Seventh Circuit Evaluation of Vocational Expert Testimony*

a.   Overman v. Astrue, 546 F.3d 456 (7th Cir. 2008)

In Overman v. Astrue, the ALJ asked the VE if "his testimony was consistent with the DOT." The VE said it was, and the claimant's attorney cross-examined the witness. The Seventh Circuit, however, found that the testimony *actually did conflict* with the DOT. Although the ALJ had complied with SSR 00-4p by asking the VE about potential conflicts, the ALJ did not complete the second step of the inquiry: he did not obtain from the VE "'a

10

reasonable explanation for the . . . conflict'" or include analysis of the conflict in his written decision. Id. at 462-63 (quoting SSR 00-4p). "SSR 00-4p imposes *an affirmative duty on the ALJ* to inquire into and resolve apparent conflicts," and "a claimant's failure to raise a possible violation of SSR 00-4p . . . does not forfeit the right to argue later that a violation occurred." Id. at 463 (emphasis in original) (citing Prochaska v. Barnhart, 454 F.3d 731, 735 (7th Cir. 2006)).

The Seventh Circuit emphasized that "Prochaska makes clear that the ALJ's *affirmative duty* extends beyond merely asking the VE whether his testimony is consistent with the DOT; the ALJ must also elicit a reasonable explanation for any discrepancy." Overman, 546 F.3d at 463 (internal quotation marks and citation omitted) (emphasis added). The court also noted that the claimant's counsel's failure to raise these issues on cross-examination was "not without consequence." Id. At the appellate level, the claimant had to show "that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve apparent conflicts." Id. (citations omitted).

> b. Weatherbee v. Astrue, 649 F.3d 565 (7th Cir. 2011)

Three years later, in Weatherbee v. Astrue, the Seventh Circuit held that SSR 00-4p "only requires ALJs to inquire about conflicts 'before *relying*' on a VE's testimony." 649 F.3d 565, 570 (emphasis in original) (quoting SSR 00-4p). Although the court did "not specify whether this inquiry should (or must) occur before or after a VE testifies," the court declined to find that it required "ALJs

11

to inquire about conflicts between a VE's testimony and the *DOT after* the VE provides her substantive testimony." Id. (citations omitted) (emphasis added).

The Weatherbee court also determined that Ruling 00-4p only requires ALJs to resolve "apparent conflicts," or conflicts that are "'so obvious that the ALJ should have picked up on [it] without any assistance.'" Id. (quoting Overman, 546 F.3d at 463). "When there is an apparent conflict, ALJs are required to obtain reasonable explanations for the conflict." Id. An ALJ does not have "to wholly disregard a VE's testimony because part of it disagrees with the DOT, but Ruling 00-4p . . . require[s] ALJs to resolve discrepancies between the two before relying on the conflicting testimony." Id. at 569.

c.    Roxbury v. Colvin, No. 13-C-1385, 2014 WL 4115862
        (E.D. Wis. Aug. 19, 2014)

"SSR 00-4p seeks to maintain consistency between VE testimony and the DOT not only to ensure that the ALJ has before him probative evidence of jobs that the claimant can actually do but also as a means of ensuring the reliability of the VE's testimony." Roxbury, 2014 WL 4115862, at *9 (citation omitted). In Roxbury, the court found that the ALJ "impeded" the claimant's "efforts to challenge the basis for the VE's conclusions." Id. Prior to the administrative hearing, the claimant's attorney "requested the issuance of a subpoena duces tecum[1] requiring the VE to bring with him documents upon

_____

[1] Administrative law judges "presiding at hearings may—issue subpoenas authorized by law; [and] rule on offers of proof and receive relevant evidence." 5 U.S.C. §556. An ALJ may issue subpoenas "on his or her own initiative or at the request of a party." 20 C.F.R. §404.950(d)(1). The subpoenas may be "for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an

12

which he may rely in forming his opinion, but the ALJ denied that request as unnecessary." Id. at *3 (internal quotation marks and citations omitted). The ALJ told the claimant that his attorney "could question the VE about where his statistical or job information came from" at the hearing, but the ALJ emphasized "that the VE was not being called as a statistician or census taker." Id.

The district court took issue with this, because in Britton, the Seventh Circuit had held that the "available on demand" rule served to facilitate cross-examination. Id. at *9 (quoting Britton, 521 F.3d at 804). "Pre-hearing guesswork and post-hearing written submissions are no substitute for counsel's ability to ask the VE precisely where in his data he found evidence of a specific number of jobs." Id. The court found that "the ALJ failed to meaningfully address [the claimant's] challenges to the date the VE said he used." Id. at *10. Further, the VE did not "demonstrate[] a reliable method for extracting specific numbers from the data," and "his testimony regarding his methodology was vague." Id.

The Roxbury court found that *any expert* should "'offer good reason to think that his approach produces an accurate estimate using professional

---

issue at the hearing." Id. If a party "wish[es] to subpoena documents or witnesses," they "must file a written request for the issuance of a subpoena with the [ALJ] . . . at least 5 days before the hearing." 20 C.F.R. §404.950(d)(2). The party must provide "the names of the witnesses or documents to be produced; describe the . . . location of the witnesses or documents . . . ; state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena." Id. See also 42 U.S.C. §405(d).

methods," but "[i]t is not sufficient for an expert to simply invoke his own expertise or experience," and an "expert who cannot or will not explain his conclusions should not be allowed to give expert testimony." Id. at 11. (citations omitted). The court remanded the case for a more sufficient step-five determination, finding that "the VE's admitted contradiction, the ALJ's refusal to require production of the VE's data, the serious doubts" raised by the claimant's attorney, "and the VE's inability to cogently explain his method," resulted in a decision not supported by substantial evidence. Id.

> d.  Barnica v. Colvin, No. 13-C-1012, 2014 WL 4443279 (E.D. Wis. Sept. 9, 2014)

In Barnica v. Colvin, the district court addressed the testimony of and the evidence supporting the opinion of a VE. The claimant had requested that the ALJ issue a subpoena "requir[ing] the VE to bring documents supporting his opinion to the hearing," specifically objecting to the VE testifying unless he provided "valid, reliable data of some sort to support such testimony." Id. (internal quotation marks and citation omitted). The ALJ rejected the request, and the VE did not produce any such evidence at the hearing.

The district court determined "that a blanket request in advance for documents does not mean that the attorney '[challenged] the foundation of the vocational expert's opinions.'" Id. at *8 (quoting McKinnie v. Barnhart, 368 F.3d 907, 910 (7th Cir. 2004)). In Barnica, the claimant's attorney did not challenge the VE's findings at the hearing, and instead posed hypothetical questions to the VE "based on various limitations counsel believed were justified" and that were "*premised* on the VE's expertise." Id. The court interpreted this as

14

counsel's recognition "that the VE had a firm basis for his opinions because [counsel attempted] to use the . . . testimony to support his client's purposes." Id. The court then admonished the claimant for attempting to "have it both ways," noting that "[g]iven the absence of any objections, the ALJ was in no position to do anything but rely on the VE's testimony, since it had not been challenged. A challenge in the district court more than a year later is hardly the forum for such an argument." Id.

The claimant also challenged the VE's use of the *Dictionary of Occupational Titles*. The court noted, "No one doubts that the DOT is old and that jobs have changed since it was last updated in 1991." Id. However, it "is still routinely used in Social Security cases, and [the claimant] has not identified any precedent in which a VE's use of the DOT was reversible error." Id. Again, the court admonished counsel for not raising these issues when cross-examining the VE at the administrative hearing:

> The time to raise such issues would be while the VE was actually testifying about the number and kinds of jobs available. Instead . . . by asking the VE hypothetical questions based on [the claimant's] limitations, counsel appeared to have conceded the VE's expertise and the foundation for his opinions.

Id.

e.     Hill v. Colvin, 807 F.3d 862 (7th Cir. 2015)

On December 3, 2015, the Seventh Circuit decided Hill v. Colvin. The court found that the ALJ had "inappropriately 'played doctor,'" had "ignored possible explanations for [the claimant's] conservative treatment," and had "conflated a desire to work with the ability to do so." Id. at 869. These mistakes

undermined the ALJ's credibility determination and "the ALJ's errors [were] not harmless." Id.

The majority opinion in Hill is a fairly unremarkable Social Security ruling. In his concurrence, however, Judge Posner addressed the issue raised by the plaintiffs in the case before this court. He wrote "separately only to focus attention on . . . a persistent, serious, and often ignored deficiency in opinions by" Social Security administrative law judges. Id. at 869-70. "The deficiency concerns testimony by vocational experts employed by the Administration concerning the number and types of jobs that an applicant deemed not to be totally disabled could perform, and the evaluation of that testimony by administrative law judges." Id. at 870 (collecting cases and secondary sources in which the "deficiency has recently . . . attract[ed] critical attention.").

In Hill, the VE "testified that the [DOT] does not describe jobs that [could] be performed" with Hill's limitations; Hill had only one functioning limb. Id. at 871. As a result, the VE used "his 'own experience' for [the] conclusion that the applicant can perform light and unskilled, or sedentary and unskilled work." Id. Judge Posner had previously "critici[zed] . . . the vocational expert who failed to explain 'how impressions from unspecified past experience and "knowledge" could enable him to determine numbers of particular jobs' that persons . . . could perform." Id. (citing Herman v. Colvin, 772 F.3d 1110, 1113 (7th Cir. 2014)). The VE in Hill "never explained what [his] experience was," and Judge Posner strongly criticized the testimony, focusing on the VE's

reliance on the DOT and the DOT's insufficient job descriptions. Id. at 871-72.

He concluded:

> In short, the vocational expert's testimony was worthless—and this apart from the apparent arbitrariness of his numerology. It is time the Social Security Disability Office cleaned up its act.

Id. at 872.

    f. <u>Forsythe v. Colvin</u>, No. 15-2333, 20016 WL 626037 (7th Cir. Feb. 17, 2016)

On February 17, 2016, the Seventh Circuit again addressed vocational expert testimony. In <u>Forsythe v. Colvin</u>, the court found that the ALJ's "decision did not deal adequately with the evidence," determined that it would "remand the case," then turned to the VE's "problematic" testimony. Id. at *3. The claimant's limitations included a "femur fracture, ankle fracture, knee arthroscopy (a surgical procedure), and the injury to his shoulder that prevented him from raising his arm." Id. The ALJ found that these limitations "did not disable [the claimant] from performing certain sedentary jobs." Id. In coming to that conclusion, the ALJ relied on the VE's testimony

> that someone with the plaintiff's impairments could nevertheless work full time as a sedentary unskilled production worker, a sedentary unskilled information clerk, or a sedentary unskilled cashier, and that in Wisconsin, where the plaintiff lives, there are 100 sedentary unskilled production worker jobs, 1000 sedentary unskilled information clerk jobs, and 2000 sedentary semiskilled (which he equated to unskilled cashier jobs. But no effort was made by the vocational expert or the administrative law judge to explain what kind of work a sedentary unskilled production worker or information clerk does, or where the vocational expert had obtained the suspiciously round numbers .

17

> . . of each type of job in Wisconsin. *They sound like guesses.*

Id. (emphasis added). The VE acknowledged that the DOT "classifie[d] cashier jobs as semi-skilled," and that the DOT "[was] out of date;" so the VE "reclassif[ied] those jobs as unskilled." Id. at 4. The ALJ did not question that statement or give it any "real consideration," and found that the testimony was "consistent with the information" in the DOT. Id. The Seventh Circuit concluded that the ALJ "wasn't paying attention." Id.

This time in a majority opinion, the Seventh Circuit remarked on this consistent and persistent problem. "[T]he only reliable statistics concerning the number of jobs in the American economy and in regions thereof are census data of broad categories of jobs, rather than data on the number of jobs within the much narrower categories of jobs that the [claimant] . . . could actually perform." Id. VE's often make "unwarranted assumption[s]" when calculating the number of jobs available in the claimant's region. Id. But, "[t]he vocational experts and administrative law judges can't be blamed for the poverty of data concerning jobs that" claimants can perform. Id. "It is high time that the Social Security Administration turned its attention to obtaining the needed data." Id. See also Allensworth v. Colvin, No. 15-2053, 2016 WL 737786 (7th Cir. Feb. 25, 2016) for a subsequent critique of VE testimony and the VE's use of the DOT to support the testimony given at the administrative hearing.

    D.    <u>Federal Review of the Commissioner's Final Decision</u>

A claimant may bring a civil, federal action only "after [a] final decision of the Commissioner of Social Security made after a hearing to which [the

claimant was a party." 42 U.S.C. §405(g). When the Appeals Council denies a plaintiff's request for review, the ALJ's decision constitutes the final decision of the commissioner. Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). "The findings and decision of the Commissioner . . . after a hearing shall be binding upon all individuals who were parties to such a hearing," and "[n]o action against the United States, the Commissioner . . . or any other officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter." 42 U.S.C. §405(g).

Judicial review under 42 U.S.C. §405(g) is limited; the court will reverse the ALJ's decision only if the ALJ did not support his decision with substantial evidence, if he based the decision on legal error, or if he so poorly articulated the decision that he has prevented meaningful review. Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Id. (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). If conflicting evidence in the record would allow reasonable minds to disagree about whether the plaintiff is disabled, the ALJ's decision to deny the application for benefits must be affirmed. Elder v. Astrue, 539 F.3d 408, 413 (7th Cir. 2008).

In order for a district court to affirm an ALJ's decision, it must find that the ALJ support the decision with substantial evidence. Johansen v. Barnhart,

314 F.3d 283, 287 (7th Cir. 2002). "Substantial evidence is evidence sufficient to convince a reasonable person that the ALJ's findings are adequate." McKinnie v. Barnhart, 368 F.3d 907, 910 (2004) (citing Johansen, 314 F.3d at 287). An ALJ faces a significant amount of evidence, but his decision does not need to "address every single piece of evidence." Id. (citations omitted). Rather, the ALJ "must build an accurate and logical bridge between the evidence and his findings." Id. (citations omitted). Adequate findings by an ALJ often turn on the testimony of the VE. While a VE's testimony must be reliable, the "reliability is measured" at a "less stringent" standard "at an administrative hearing than under the Federal Rules of Evidence." Id. (citing Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)).

The district court must review the entire record, including both the evidence that supports the ALJ's conclusions as well as evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." Eichstadt v. Astrue, 534 F.3d 663, 665-66 (7th Cir. 2008). The district "court will uphold the ALJ's decision so long as the record reasonably supports it and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." Id.

## II.  THE COMMISSIONER'S MOTION TO DISMISS (DKT. NO. 19)

On April 17, 2015, the Commissioner filed a motion to dismiss the plaintiffs' complaint. Dkt. No. 19. On page 10 of the brief in support of the motion, the Commissioner quoted Steele Co. v. Citizens for a Better Env't, 523

20

U.S. 83, 104 (1998) and several other Supreme Court decisions for the proposition that a district court should determine whether it has subject-matter jurisdiction before proceeding to the merits of a claim. The Commissioner discusses the jurisdictional issue on pages 23-25, stating that the court should "reach" the question of whether the plaintiffs have standing, and should determine that the majority of them do not because they cannot prove injury. At the end of this discussion, they ask the court to dismiss "[t]he claims of such Plaintiffs . . . under Rule 12(b)(1) [of the Federal Rules of Civil Procedure]." Id. at 25. The remainder of the Commissioner's brief discusses why the Commissioner believes the court ought to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

The court agrees with the defendant that it cannot analyze the merits of the plaintiffs' claims (including whether their complaint states a claim for which relief can be granted) until it first determines whether it has subject-matter jurisdiction. The court does not see this issue as one that it must "reach;" the court must assure that it has subject-matter jurisdiction before all else. Accordingly, the court will address the jurisdictional question first.

A.   Standard for Fed. R. Civ. P. 12(b)(1)

A Rule 12(b)(1) motion to dismiss challenges the court's authority to hear the case or controversy. Put another way, it challenges the plaintiffs' standing to bring the suit. This "is an essential component of Article III's case-or-controversy requirement." Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

21

"[T]he plaintiff bears the burden of establishing standing." Id. (citing Perry v. Vill. of Arlington Heights, 186 F.3d 826, 829 (7th Cir. 1999)). "Because standing is 'not a mere pleading requirement but rather an indispensable part of the plaintiff's case, it must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" Id. (quoting Lujan, 504 U.S. at 561).

The Commissioner brings a factual challenge to the plaintiffs' complaint, alleging "'that there is *in fact* no subject matter jurisdiction.'" Id. at 444 (quoting United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 946 (7th Cir. 2003)). "[W]hen considering a motion that launches a factual attack against jurisdiction, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." Id. (internal quotation marks and citations omitted). "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). The court must not attach any "presumptive truthfulness to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id.

This is a result of "the importance of limiting federal jurisdiction." Apex Digital, 572 F.3d at 444. Parties cannot create jurisdiction by consenting, and

"'if the facts place the district court on notice that the jurisdictional allegation [might be] false, the court is duty-bound to demand proof of its truth.'" Id. (quoting Kanzelberger v. Kanzelberger, 782 F.2d 774, 777 (7th Cir. 1986)).

        1.   *Named Plaintiffs*

The Commissioner's standing challenge is based on her argument that the "vast majority" of the plaintiffs have not sustained any injury. This court agrees with the Commissioner that it does not have subject-matter jurisdiction over the majority of the named plaintiffs, but its decision is not based on whether any of the plaintiffs have suffered injury.

In considering whether or not the court should dismiss any or all of the named plaintiffs on Article III standing principles, one must first look at how the plaintiffs are situated. The complaint alleges that all of the named plaintiffs reside in Wisconsin and "have applied for disability benefits." Dkt. No. 1 at ¶¶24, 26-60. The claimants do not, however, have identical claims before the Social Security Administration, and their claims are at various stages in the administrative process. With regard to their progress through the administrative procedure, they generally fall into two groups.

The first group consists of claimants who have made a request for vocational expert evidence and testimony prior to an administrative hearing. In each of these claimant's cases, the ALJ has refused their requests, held a hearing on their claims, and issued a final decision. Specifically:

> . . . Of the thirty-five named Plaintiffs, . . . [t]wo have had an ALJ hearing and now have claims pending before the Appeals Council. [Compl. at] ¶¶ 28-29. Three have received final SSA decisions, challenged those decisions, and had their claims

23

remanded to the SSA. *Id.* ¶¶ 26-27, 30. The Complaint indicates that one of these three is waiting for a new ALJ hearing, and one has received a hearing and appealed the resulting decision to the Appeals Council, but does not specify the status of the third. *Id.* ¶¶ 26-27, 30.

Of these three Plaintiffs who previously received SSA final decisions and then had their claims remanded to SSA on judicial review, one (and only one) had her claim remanded because the reviewing court found the ALJ had not complied with Seventh Circuit authority concerning VE testimony . . . . Pls.' PI Mot. App. A, *Roxbury v. Colvin*, No. 13-c-1385, at 10 (E.D. Wis. Aug. 19, 2014). The other two had their cases remanded for unrelated reasons. *See* PI Opp'n Attach. 3, *Ash v. Astrue*, No. 11–C–0900, 2012 WL 6115099, at *6 (E.D. Wis. Dec. 10, 2012 (declining to reach the question of whether the "available on demand" standard has been met because the SSA's decision was based on Step 4; *Hanson v. Colvin*, 760 F.3d 759 (7th Cir. 2014).

Dkt. No. 20 at 12-13.

The remaining thirty named plaintiffs had not yet, at the time of the complaint, had hearings before an ALJ. Dkt. No. 1 at ¶¶ 31-60. These plaintiffs allege that because the SSA "has gone so far as to adopt clandestine policies that prevent the plaintiffs from having a fair hearing, any further time spent in administrative proceedings would be futile." Dkt. No. 25 at 12. They argue that they "have no realistic chance of getting the Commissioner to comply with circuit precedent through isolated attacks in administrative proceedings; indeed, frequent remands from federal courts have already failed to remedy the situation." Id. at 13. They argue that it would be futile for this court to require them to go through hearings before bringing their constitutional claims. Id.

2.     *Jurisdictional Analysis*

The named plaintiffs in the instant case are not asking the court to grant them benefits. The plaintiffs in the first group are not seeking traditional district court review, under 20 C.F.R. §404.90(a)(1)-(5), of the specific bases of each ALJ's decision. The plaintiffs in the second group have not even received decisions from an ALJ that a district court *could* review.

Rather, the plaintiffs ask the court to impose the following declaratory relief:

> Declare, pursuant to 28 U.S.C. §§ 2201-02 that the Commissioner, through her agents, has maintained a clandestine policy throughout Wisconsin, Indiana and Illinois of unlawfully directing ALJs to ignore controlling case law established by the U.S. Court of Appeals for the Seventh Circuit in violation of the Due Process Clause of the U.S. Constitution, the Social Security Act and the Administrative Procedures Act, and the Commissioner's own regulations.

Dkt. No. 1 at 28-29. The complaint asks that once the court makes this declaration, it impose certain forms of injunctive relief, including ordering the Commissioner to require VEs to produce the data upon which they relied at every hearing; compelling ALJs to include that statistical data in their decisions; ordering new hearings for the plaintiffs who asked for statistical data but had their requests denied; and requiring the Commissioner to conduct training and monitor future hearings for compliance. Id. at 29-30.

The last sentence of §405(h) of Title II of the Social Security Act prohibits anyone from bringing an original action against the Commissioner in district court "to recover on any claim arising under this subchapter." In Weinberger v. Salfi, 422 U.S. 749, 762 (1975), the Supreme Court held that this provision

25

"does not preclude constitutional challenges." Rather, the Court held, the words of §405(h) "simply require that [constitutional challenges] be brought under jurisdictional grants contained in the [Social Security] Act, and thus in conformity with the same standards which are applicable to nonconstitutional claims arising under the Act." Id.

The question, then, is whether the named plaintiffs bring their constitutional claims "under the jurisdictional grants contained" in the Act. What are those "jurisdictional grants?" Section 405(g) of Title II lays out the requirements for judicial review. To obtain district court review under §405(g), a claimant must meet three requirements: (1) she must have obtained a final decision from the Commissioner, after a hearing; (2) she must bring the civil action within sixty days after receiving notice of the Commissioner's final decision; and (3) she must file the action in the correct jurisdiction. Weinberger, 422 U.S. at 763-64. The second and third of these three elements "specify, respectively, a statute of limitations and appropriate venue," and "are waivable by the parties" if not "timely raised." Id. at 764 (citing Fed. R. Civ. P. 8(c) and 12(h)(1)). The first element, however, is "central to the requisite grant of subject-matter jurisdiction—the statute empowers district courts to review a particular type of decision by the Secretary, that type being those which are 'final' and 'made after a hearing.'" Id.

a.      Plaintiffs Who Have Not Yet Received a Final Decision

The named plaintiffs who have not yet received a final decision from an ALJ do not meet this "central" requirement for federal subject-matter

26

jurisdiction. Indeed, the Weinberger Court directly addressed identically-situated plaintiffs. The Weinberger Court found that as to any class members for whom there were "no allegations that they have even filed an application with the Secretary, much less that he has rendered any decision, final or otherwise," the district court "was without jurisdiction over so much of the complaint as concerns" those plaintiffs. Id. at 764.

This group of plaintiffs argues that there is no point in making them go through the process of a hearing, and no point in requiring them to obtain a final decision from the Commissioner, because to do so would be futile. They argue that given what they allege to be the Commissioner's "clandestine policy" of ignoring the Seventh Circuit's directives regarding access to VE supporting data, they do not need to go through a hearing and receive a final decision to know that any such hearing will violate their Fifth Amendment due process rights. Dkt. No. 25 at 12-13.

In support of this argument, the plaintiffs cite Johnson v. Sullivan, 922 F.2d 346 (7th Cir. 1991). However, neither Johnson nor the decision upon which it relied, Bowen v. City of New York, 476 U.S. 467 (1986), did away with the Weinberger federal subject-matter jurisdiction analysis. Those decisions considered whether plaintiffs who had received a final decision ought to be required to exhaust "[their] administrative remedies by proceeding through all three stages of the *administrative appeals process.*" Bowen, 476 U.S. at 482 (emphasis added). See also Johnson, 922 F.2d at 353 ("In *Johnson I,* we held that the plaintiffs had met the *sine qua non* requirement of having filed a claim,

27

thus satisfying the only truly jurisdiction component of the finality test. [Johnson v. Heckler,] 769 F.2d [1202] at 1209 [(7th Cir. 1985)]. . . . Our only remaining determination is whether judicial waiver of the exhaustion requirement is called for under the circumstances presented here.")

The plaintiffs also argue that their constitutional claim is "entirely collateral to the underlying merits of" the plaintiffs' disability applications. Dkt. No. 25 at 8. They refer to the "collateral attack" or "collateral claim" doctrine referenced in the Supreme Court's decision in Mathews v. Eldridge, 424 U.S. 319 (1976). In Mathews, the court held that the claimant was not required to exhaust his statutory administrative remedies because his "constitutional challenge [was] entirely collateral to his substantive claim of entitlement." Id. at 330. Again, the "collateral attack" doctrine does not provide an exception to the "nonwaivable jurisdictional element" that the plaintiff have obtained a final decision from the Commissioner. Id. The collateral attack comes into play in a court's decision regarding whether to waive the statutory requirement that plaintiffs exhaust their post-decision remedies.

The cases the parties cite—plaintiffs and defendant alike—acknowledge over and over again the Supreme Court's holding in Weinberger that a district court has subject matter jurisdiction only over those plaintiffs who have met the first element of the §405(g) analysis by obtaining a final decision from the Commissioner. Under F. R. Civ. P. 12(b)(1) and Weinberger, this court must dismiss any plaintiffs who have not received such a final decision, because it has no subject-matter jurisdiction over their claims. Accordingly, the court will

dismiss the plaintiffs named in paragraphs 31 through 60 of the complaint (plaintiffs Scholten through Kinter).

b.      Plaintiffs Who Have Received a Final Decision

As discussed above, five of the named plaintiffs have received a final decision from the administrative law judge: Margaret Ash, Randy Hanson, Ronald Musselman, Brian Dolezar, and Diane Marotti-Roxbury. Dkt. No. 1 at 9-11. Thus, this court has subject-matter jurisdiction over their claims. The court next will consider the Commissioner's other argument for dismissal—her claim that the remaining five plaintiffs fail to state a claim upon which relief can be granted.

B.      Standard for Fed. R. Civ. P. 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must state a claim for relief that is plausible on its face." Lodholtz v. York Risk Servs. Group, Inc., 778 F.3d 635, 639 (7th Cir. 2015) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Lodholtz, 778 F.3d at 639 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The court "draw[s] all reasonable inferences and facts in favor of the nonmovant," but the court "need not accept as true any legal assertions." Lodholtz, 778 F.3d at 639 (citing Vesely v. Armslist LLC, 762 F.3d 661, 664-65 (7th Cir. 2014)).

To state a claim under the federal notice pleading system, the plaintiff must provide a "short and plain statement of the claim showing that [he] is

29

entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A plaintiff does not need to plead specific facts, and [her] statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). However, a complaint that offers "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." Id. (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The complaint allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citation omitted).

In considering whether a complaint states a claim, courts follow the principles set forth in Twombly. First, they must "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. A plaintiff must support legal conclusions with factual allegations. Id. Second, if there are well-pleaded factual allegations, courts must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

The Commissioner provides two arguments in support of dismissal for failure to state a claim. First, she argues that the court must dismiss the

30

claims of the remaining plaintiffs because they have not exhausted their administrative remedies. Dkt. No. 20 at 15. Second, she argues that the plaintiffs' complaint seeks relief that the Seventh Circuit's precedent does not require. Id. at 28.

1.    *Failure to Exhaust Administrative Remedies*

In Mathews, the Secretary of Health, Education and Welfare (then charged with administration of the Social Security program) argued that the claimant could not seek judicial review of the termination of his benefits because he did not appeal the initial termination decision. Mathews v. Eldridge, 424 U.S. at 328. In other words, the Secretary argued that the claimant had not met the mandatory "final decision" element of §405(g), necessary for subject-matter jurisdiction under Weinberger. The Supreme Court disagreed.

The Mathews Court found that "[i]mplicit" in its Weinberger analysis was that the "final decision" condition "consist[ed] of two elements, only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived' by the Secretary in a particular case." Id. The Court explained,

> The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no 'decision' of any type. And some decision by the Secretary is clearly required by the statute.

Id.

With regard to the "waivable" element—the exhaustion element—the Court first noted that the Secretary could waive his own exhaustion

requirement "if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief sought is beyond his power to confer." Id. at 330. The Court, looking back to the Weinberger decision, found that while the question of whether a decision was final "ordinarily" rested with the Secretary, "cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." Id.

In determining that claimant Eldridge's claim was one such case, the Court first found that his "constitutional challenge was entirely collateral to his substantive claim of entitlement." Id. Second, the Court found that Eldridge had "raised at least a colorable claim that because of his physical condition and dependency upon the disability benefits, an erroneous termination [of those benefits] would damage him in a way not recompensable through retroactive payments." Id. at 331.

Ten years later, the Bowen Court characterized the Mathews Court's holding as a two-part test for determining whether a court should waive the exhaustion requirement: "the claims were collateral to any claim for benefits, and the harm imposed by exhaustion would be irreparable." Bowen, 476 U.S. at 476. The Seventh Circuit has articulated that two-part test this way:

> Waiver of the exhaustion requirement is appropriate only where (1) the plaintiffs' suit involves a collateral attack rather than one on the merits, and (2) the plaintiffs' interest in prompt judicial review is so compelling that deference to the agency's determination is inappropriate.

32

Johnson, 922 F.2d at 352-353 (citing Bowen, 476 U.S. at 483). In order for this court to determine whether to waive the exhaustion requirement for the remaining five defendants (assuming, without deciding, that there are those among the five who have not exhausted their administrative remedies), the court must answer the two Eldridge questions.

a.    Whether the Claim is a Collateral Attack

The Commissioner argues that the plaintiffs are challenging "how ALJs apply SSA regulations when making benefit determinations, but are not challenging any regulations themselves . . . ." Dkt. No. 20 at 17. She argues that such a challenge to how ALJs apply regulations is not "collateral" to the benefit claims. In support of this argument, the Commissioner quotes from the Seventh Circuit's decision in Britton v. Astrue, 521 F.3d 799 (7th Cir. 2008). The plaintiff in Britton argued that "she should have had more access to the VE's data . . . ." Id. at 803. The Seventh Circuit stated that "Britton's challenge regarding her access to the VE's data is really an argument that the Commissioner failed to satisfy his step-five burden of 'providing evidence' demonstrating that other work the claimant [could] perform 'exist[ed] in significant numbers in the national economy." Id. (citing 20 C.F.R. §404.1560(c)(2)). The Commissioner bases her argument that the plaintiffs' constitutional claim is not collateral on this language.

The Britton court was not faced with the need to determine whether the plaintiff had exhausted her remedies. In that case, "[t]he Appeals Council [had] denied Britton's request for review, making the ALJ's decision the final decision

33

of the Commissioner," and "the district court [had] upheld that final decision." Id. So the Britton court considered only whether the ALJ had, in fact, satisfied his step-five burden under the facts presented. The Commissioner draws from this the broader argument that "the validity of an ALJ'[s decision regarding access to VE data cannot be properly evaluated outside of the context of the Step 5 analysis in a particular case." Dkt. No. 20 at 18.

The court disagrees. The plaintiffs contend that the Commissioner has a "clandestine" policy which, in essence, instructs ALJs across the board, in all factual circumstances, that they need not (perhaps should not) provide claimants with the data upon which the VE relied. The court finds that this constitutional claim—that it is a violation of the Fifth Amendment to enforce a policy which denies claimants the ability to test the reliability of a VE's testimony—is collateral to the question of whether any particular ALJ erred in conducting the step five analysis. The Seventh Circuit held similarly in Marcus v. Sullivan, 926 F.2d 604, 614 (7th Cir. 1991), when it stated that "[c]laims of system-wide violations by the Secretary are collateral to claims for individual benefits."

> b.   Whether Requiring Exhaustion Would Constitute Irreparable Harm
>
> i.   *Factual Circumstances of the Five Plaintiffs*

The irreparable harm portion of the waiver-of-exhaustion analysis requires a closer look at the claims of the five plaintiffs who have obtained final decisions.

### *Plaintiff Ash*

The complaint states that Margaret Ash filed her claim for benefits on February 7, 2008. Dkt. No. 1 at 9. She had her hearing before the ALJ on March 9, 2010. Id. Before that hearing took place, her lawyer "made a 'demand' that the defendant's vocational expert produce at the hearing all statistical data that the vocational expert intended to rely upon as a basis for their testimony." Id. The ALJ refused to order the production of this information, concluding that it was too "burdensome," and that the VE needed only to give a summary of her methodology. Id. After the hearing, the plaintiff objected that the VE had relied on software that hadn't been available to the plaintiff, and would cost $2,000 to purchase. Id. The plaintiff appealed the ALJ's decision to the district court, which remanded the case back to the ALJ. Before the remand hearing, the plaintiff again demanded the statistical data. The ALJ (a different one) refused, again reasoning that requiring production of the data would be "burdensome." Id. At this second hearing, the VE testified that she had relied on a "proprietary software package—Job Browser." Id. The VE testified that she didn't know what methodology that software used. The second ALJ also denied the plaintiff's benefits claim, and as of the date of the complaint, plaintiff Ash's claim was pending before the Appeals Council. The complaint alleges that plaintiff Ash "has suffered severe financial hardship due to the delays caused by the Commissioner's clandestine policy." Id.

### *Plaintiff Hanson*

Plaintiff Randy Hanson filed his claim for benefits on July 27, 2004. Id. His hearing took place on May 7, 2007. Id. The ALJ denied benefits, the plaintiff appealed, and the Appeals Council remanded for another hearing before the same ALJ. Id. At the second hearing, which took place on April 1, 2008, the ALJ "issued a partially favorable decision . . . finding the plaintiff to be disabled as of 4/12/07." Id. The plaintiff again went to the Appeals Council, which again remanded. On October 8, 2010, the ALJ (now a new one) determined that the plaintiff was not disabled and never had been (contradicting the original ALJ's finding from the second hearing). Id. at 10. The complaint says, "The most recent decision from ALJ Ritter was reversed and remanded by the United States Court of Appeals for the Seventh Circuit on July 30, 2014," and cites Hanson v. Colvin, 760 F.3d 759 (7th Cir. 2014). Id. The complaint alleges that before each of his three hearings, his attorney demanded the VE's statistical and vocational data, and at each hearing, his attorney challenged the VE's testimony. Each time, the ALJ denied the request. Id.

In its decision regarding plaintiff Hanson's appeal, the Seventh Circuit indicated that the case "[came] down to what the administrative law judge thought, probably erroneously, was a disagreement between two physicians whose examination reports were submitted in the administrative proceeding." Hanson, 760 F.3d at 760. While both physicians' reports diagnosed the plaintiff with "radiculopathy (a nerve disorder that causes radiating pain)," one of the

36

reports was unclear on how severe the condition was. Id. The Seventh Circuit surmised that the ALJ might have thought the two reports conflicting; the Seventh Circuit did not find them so. The court found that "a finding of total disability could . . . well be based on the reports considered together," and noted that if the ALJ had been uncertain, he could have ordered a further examination by a qualified physician, who then could testify about the plaintiff's ability to engage in full-time work. Id. at 762. The court also rejected the government's argument that the ALJ had expressed skepticism about the plaintiff's credibility, noting that the ALJ had not based his decision on a credibility determination. Id. The court reversed and remanded to the district court with instructions to remand back to the SSA. Id. The complaint does not indicate any progress in the case beyond that July 30, 2014 remand, but the plaintiff alleges that "[o]ver the last 10 years, the plaintiff has suffered significant financial hardship due to the . . . delays caused by the Commissioner's clandestine policy." Id.

### Plaintiff Musselman

Ronald Musselman filed his claim on January 10, 2012; it was denied, and he appealed. Dkt. No. 1 at 10. The hearing before the ALJ took place on August 5, 2014; prior to the hearing, the plaintiff's counsel made a demand for the VE's data. The ALJ refused the demand at the hearing, on the basis that it was "premature and overbroad." Id. The ALJ refused benefits on September 29, 2014, and as of the time of the complaint, the claim was pending before the Appeals Council. Plaintiff Musselman argues that he has suffered financial

37

hardship as a result of the delays "caused by the Commissioner's clandestine policy." Id.

### Plaintiff Dolezar

Plaintiff Brian Dolezar filed his claim on August 15, 2011. Id.at 11. The original administrative hearing took place on June 25, 2013, and a supplemental hearing took place on February 4, 2014. Id. Before each hearing, the plaintiff demanded the VE's data, and the ALJ refused. Id. The ALJ denied benefits on March 24, 2014. Id. As of the time of the complaint, the claim was on appeal before the Appeals Council, and the plaintiff alleges that he has "suffered severe financial hardship due to the delays caused by the Commissioner's clandestine policy." Id.

### Plaintiff Marotti-Roxbury

Diane Marotti-Roxbury filed her claim for benefits on September 22, 2004. Id. The complaint indicates that she has had "multiple administrative hearings . . . and multiple federal court reviews." Id. At the last federal court review, the district court reversed and remanded based on "serious doubts about the reliability of the VE's testimony." Id. (quoting Roxbury v. Colvin, Case No. 13-cv-1385 (E.D. Wis. Aug. 19, 2014). The Appeals Council subsequently assigned the case to a different ALJ. Id. The plaintiff argues that she

> cannot reasonably be assured that if a 'demand' is made that the defendant's vocational expert produce at the hearing all statistical data the vocational expert intended to rely upon as a basis for their testimony [it] would be honored given the refusal of the Social Security Administration's Administrative Law Judges to follow controlling Seventh Circuit case law.

Id. The plaintiff alleges that she has suffered "severe financial hardship due to the delays caused by the Commissioner's clandestine policy." Id.

In remanding the case in August of 2014, the district court specifically stated, "This case must be remanded for a fresh step five determination based on reliable vocation evidence and for reconsideration of the evidence regarding plaintiff's manipulative and mental limitations." Roxbury v. Colvin, 13-cv-1385, Dkt. No. 22 at 29.

In their brief in opposition to the motion to dismiss, the plaintiffs indicate that plaintiff Marotti-Roxbury's "remand hearing has already occurred, and the ALJ, for reasons not explained by any disclosed policy of the Social Security Administration continues to prevent Marotti-Roxbury from obtaining the facts and data underlying the vocational expert's testimony." Dkt. No. 25 at 8. The plaintiffs explain:

> On remand, 52 days before the new hearing, Ms. Marotti-Roxbury renewed her request to subpoena the data that the vocational expert intended to reply upon. The ALJ ignored this request until confronted about it at the hearing. (See Partial Transcript of Diane Marotti-Roxbury Hearing, at 1, attached as Exhibit 4.) Despite having already been reversed by the district court for issues related to the production of vocational expert data, the ALJ claimed to have "overlooked" the subpoena request, because it was "all kind of mixed in" with other documents in the case. *(Id.)*

> \* \* \* \* \*

> Within *mere moments* of learning of the subpoena request, and apparently without ever reading the subpoena, the ALJ found it to be unduly burdensome. (See attached Exhibit 4, at 3.)

> \* \* \* \* \*

39

Perhaps this situation could have been remedied, and the hearing could have gone forward, if the vocational expert had independently elected to bring his source material to the hearing. But the ALJ had scheduled the vocational expert to testify by phone, even though Ms. Marotti-Roxbury had objected to this form of testimony, specifically because of the need to view the expert's materials. (See attached Exhibit 5 at 3.) As a result, Ms. Marotti-Roxbury had no access to the materials needed to conduct a proper cross-examination of the vocational expert.

Id. at 10-11.

In a footnote, the plaintiff further explained,

The ALJ instead offered that the vocational expert could provide the citation over the phone, the attorney could look up the citation after the hearing, and then "if you feel it is necessary that you want to do further cross-examination we will schedule it for another hearing." (See attached Exhibit 4, at 4.) Thus Ms. Marotti-Roxbury, who initially applied for benefits in *2004* is being punished with further delays for trying to demand to see the materials being used to deny her claim.

Id. at 9 n.5.

The attachments to the brief in opposition show that on March 9, 2015, plaintiff Marotti-Roxbury's attorney sent the ALJ before whom the remand hearing was to take place a six-paged, single-spaced "demand" for a subpoena to the VE for the documents upon which the VE intended to rely at the hearing. Dkt. No. 25-4 at 6-11. The letter reads more like a brief, with extensive case citations and explanations about why the plaintiff was asking for the material to be subpoenaed. The letter specifically asks that if the ALJ believes the request to be "overbroad or burdensome," the ALJ should advise counsel before the hearing, and he would consider amending his requests. Id. at 10. Attached

to the letter is a list of the types of information the plaintiff sought through the subpoena. Id. at 12-17.

The remand hearing took place on April 30, 2015 (not quite two months after the plaintiff asked for the subpoena). Id. at 4. When the plaintiff's counsel stated that he was renewing the objections to the VE that he'd raised in his subpoena request, the ALJ responded,

> When did you submit it because I do not recall that I saw it I thought you, it is a pretty big file and I looked through the E section and I thought I specifically looked for that and I did not see one filed in this case. Unless I overlooked it.

Id. The ALJ subsequently found the subpoena request, and marked it as an exhibit. She then stated,

> Sorry I didn't respond to it because then everything has been coming kind of groups and . . . in here and all kind of mixed in. I will send a letter out. Basically, I'm going to deny it. I believe it is overbroad and burdensome and you will certainly have an opportunity to question the vocational expert. I will just send that out and I will include the copy in the file as an exhibit.

Id.

Counsel for the plaintiff then reminded the ALJ that the "remand order from the District Court said that the data underlying the vocational expert testimony must be available on demand to facilitate the cross-examination." Id. He reminded the ALJ that he had objected to the VE testifying by phone, and verified that the VE was in her office in northwest Wisconsin. Id. He then renewed his demand for the data. The ALJ replied, "She said she would give you the citation for that. She can give it to you right now." Id. at 5. Counsel responded, "The [district] court said it has to be available on demand for the purpose of cross-examination, not later." Id. The ALJ responded, "We will let

41

her give it to you and if you feel it is necessary that you want to do further cross-examination we will schedule it for another hearing." Counsel responded, "Okay," but the ALJ hadn't finished, continuing "[w]ith the vocational expert and this will keep going on and on and on. We can do that, but." Id. Counsel tried again: "You know the Seventh Circuit says they don't want, these things shouldn't be prolonged unnecessarily and the problem is when these experts aren't required to put their cards on the table, and it is nothing personal to [the VE], believe me." Id. The ALJ put an end to the matter: "Well not knowing what she was going to rely on and what her testimony would be and all of this, that's why we have the testimony. She has indicated what she has relied on and she can give you to the citation for that and you can look that up." Id.

          ii.    *Analysis of the Plaintiffs' Circumstances*

These five plaintiffs have been waiting anywhere from four years and two months (plaintiff Mussleman) to eleven years and eight months (plaintiff Hanson) to completely exhaust their administrative claims. While waiting, the plaintiffs have not, obviously, had the financial benefit of benefits. Plaintiff Ash has made two trips to the Appeals Council and is on her third. Plaintiff Hanson has visited the Appeals Council twice and the Seventh Circuit once (although it does not appear that he raised the issue of the ALJ's refusal to provide VE supporting data in that appeal); it is not clear where his case stands now. Plaintiffs Musselman and Dolezar are on their first trips to the Appeals Council. After over eleven years, plaintiff Marotti-Roxbury's case has been

assigned to a new ALJ with specific instructions that that ALJ conduct a new step five determination based on "reliable" vocational data.

Given that the five plaintiffs are at different stages in the exhaustion process, it is difficult to predict what the practical effect of requiring them to exhaust their remedies before seeking judicial determination will be. Some may already have moved on to another stage in the process. Others may have months more to wait, or years.

Does the fact that these plaintiffs have waited years for a final benefits determination, without having been given access to the supporting documentation relied upon by the VEs who provided testimony at their administrative hearings, constitute "irreparable harm?" The plaintiffs argue that it does. They argue that they have "suffered extended period of unemployment while pursuing their claims, and it is common for claimants to fall into homelessness or suffer preventable medical setbacks while awaiting benefits." Dkt. No. 25 at 9. They also argue that they have "no realistic chance of getting the Commissioner to comply with circuit precedent through isolated attacks in administrative proceedings; indeed frequent remands from federal courts have already failed to remedy the situation." Id. at 13 (citations omitted). Thus, they argue, requiring them to exhaust their administrative remedies would be "patently futile." Id. (citing Johnson v. Heckler, 769 F.2d 1202, 1208 (7th Cir. 1985)).

The first argument—that waiting for years to obtain benefits causes irreparable harm—sounds of the Seventh Circuit's conclusion in Marcus v.

Sullivan, 926 F.2d 604 (7th Cir. 1991). In that case, the Secretary argued that the plaintiffs could not prove irreparable harm, because "claimants who are eventually successful in the administrative process can obtain full benefits, though only retroactively." Id. at 614. The Seventh Circuit disagreed, finding that "[a] delayed receipt of disability benefits, however, cannot suffice to make the claimant whole. Any delay potentially subjects claimants to deteriorating health, and even death. Claimants need to receive funds promptly because they use their benefits to purchase the very necessities of life." Id. (citations omitted).

The five plaintiffs here have been without employment or benefits for anywhere from four to twelve years. The complaint does not provide information about their financial conditions—how they have been getting by during these extended periods of time. They each assert, however, that the delays they have incurred have caused them financial hardship.

The plaintiffs' second argument relates to futility. The Seventh Circuit has held that "[w]aiver [of administrative remedies] . . . is appropriate where the pursuit of administrative remedies would be futile because the Secretary's position on the statutory issues is 'final.'" Heckler, 769 F.2d at 1207 (quoting Kuehner v. Schweiker, 717 F.2d 813, 817 (3d Cir. 1983)) (subsequent history and other citations omitted). In concluding that the plaintiffs had demonstrated such futility, the Heckler court adopted the reasoning of the district court below:

> [t]he experience of the two named plaintiffs, who did exhaust, illustrates the futility of exhaustion—the Secretary's published

44

policies are not likely to be influenced or changed by the administrative appeals of any single individual; thus the issue is unsuited to resolution in the hearing process. That the challenged policies are published both in the federal regulations and in Social Security Rulings further suggests the final nature of the Secretary's position. Finally, the validity of the policies challenged here has been raised in other litigation, giving the Secretary an ample opportunity to reconsider [but] she has not done so.

Id. at 1208 (quoting Johnson v. Heckler, 100 F.R.D. 70, 74 (N.D. Ill. 1983)).

The plaintiffs allege in this case that it is an unpublished, "clandestine" policy which renders exhaustion of administrative remedies futile. The Supreme Court considered the futility concept in a similar context in Bowen v. City of New York. The Bowen Court considered "an internal policy of the Secretary of Health and Human Services that had the effect of denying disability benefits to numerous claimants who may have been entitled to them." Bowen, 476 U.S. at 469. The plaintiffs in that case argued that the Secretary had an "unlawful, unpublished policy" which "mandated a presumption . . . that a failure to meet or equal the listings was tantamount ot a finding of ability to do at least unskilled work; that the presumption led to routine denials of benefits to eligible claimants; and that such a presumption was arbitrary, capricious, and violative of the Constitution" and other laws. Id. at 473.

The Bowen Court found that it would be futile to require plaintiffs confronted with this unpublished policy to exhaust their administrative remedies.

. . . the District Court found a systemwide, unrevealed policy that was inconsistent in critically important ways with

45

established regulations. Nor did this policy depend on the specific facts of the case before it; rather, the policy was illegal precisely because it ignored those facts. The District Court found that the policy was being adhered to by state agencies due to pressure from SSA, and that therefore exhaustion would have been futile. Under these unique circumstances, there was nothing to be gained from permitting the compilation of a detailed factual record, or from agency expertise.

Id. at 485.

The Bowen Court also found that the district court's action of ordering cases to be reopened at the administrative level "showed proper respect for the administrative process. It did no more than the agency would have been called upon to do had it, instead of the District Court, been alerted to the charge that an undisclosed procedure was illegal and had improperly resolved innumerable claims." Id.

Finally, the Bowen Court addressed the petitioners' argument that "had class members exhausted administrative remedies, some might have received benefits despite the illegal policy," and that some "may have been disqualified [from obtaining benefits] for reasons having nothing to do with the illegal policy." Id. The Court concluded that "[s]uch observations, however, merely serve to remind us why exhaustion is the rule in the vast majority of cases; they do not aid the Court in deciding when exhaustion should be excused." Id. at 486. For these reasons, the Court found that the district court did not err in waiving the exhaustion requirements "either with respect to those claimants whose time to further administrative appeals had lapsed, or with respect to those claimants who still had time to pursue administrative remedies." Id.

In her reply brief, the Commissioner responds that exhaustion is not futile, because there have been "numerous occasions" in which courts have found that "ALJs have complied with the Seventh Circuit's admonition to make available data and reasoning underlying VE testimony." Dkt. No. 27 at 10. The Commissioner cites to seven cases in support of this argument, including plaintiff Hanson's (noting that it was reversed on other grounds). Id. She argues that because there are several ways that a VE can satisfy the Seventh Circuit's concerns—by bringing to, and providing at, the hearing the source documents; by orally explaining sources and reasoning; by orally providing citations to sources and allowing counsel to look them up—the plaintiffs cannot prove that the Commissioner has a "policy" of violating Seventh Circuit directives. Id. at 11-12. The Commissioner also argues that simply having to go through the administrative process, by itself, cannot constitute irreparable harm, because such a finding would "render the irreparable harm requirement a nullity." Id. at 13.

In this case, the question of futility is intensely fact-bound. The policy the plaintiffs allege is that the Commissioner has "instructed ALJs to routinely ignore the commonsense requirement that claimants have their cross-examinations of vocational experts be informed by the materials on which the expert claims reliance." Dkt. No. 25 at 3. In a motion to dismiss, the court need not determine whether the plaintiffs can prove that such a policy exists; it need only determine whether the plaintiffs have pled sufficient factual content to allow the court to draw the reasonable inference that the defendant could be

47

liable. In a somewhat similar way, the question of whether it would be futile to make a claimant pursue administrative remedies is answered by looking at the facts the particular plaintiff has pled.

As of the time of the complaint, plaintiffs Ronald Musselman and Brian Dolezar each had asked for VE data before their hearings, been denied the data, received an unfavorable ruling, and taken their claim to the Appeals Council. While over four years have elapsed since these two plaintiffs filed their claims, their cases have not yet been remanded to the ALJs, to give the ALJs the opportunity to provide VE data in compliance with the Seventh Circuit's extensive precedent. It has been less than two years since Mussleman was denied his benefits, and a bit more than two years since Dolezar was denied his. Two years is a long time without employment or benefits, but it appears that, with regard to these two plaintiffs, they are in a somewhat similar posture to many other claimants who seek review of the denial of benefits on other bases. Because the Appeals Council has not had an opportunity to review whether the ALJs in their cases complied with Seventh Circuit policy, it is not appropriate for this court to waive exhaustion at this time.

Randy Hanson filed his claim for benefits almost twelve years ago, and has had a trip to both the district court and the Seventh Circuit. Hanson raised the lack of VE data in the district court. Hanson v. Colvin, No. 12-cv-0822, 2013 WL 5273956 at *6 (E.D. Wis. September 18, 2013). The district court, however, found no error in that aspect of Hanson's administrative process.

> The court finds no error where Hanson's counsel had the
> opportunity to cross-examine [the VE] at the hearing

regarding the sources for the data that supported her testimony. [The VE] testified on cross-examination that the figures were obtained from the U.S. Department of Labor, Bureau of Labor Statistics, and the Workforce Development Center in Wisconsin. Furthermore, prior to the hearing, [the VE] identified the May 2008 State Occupational Employment and Wage Estimate provided by Hanson's counsel. Additionally, [the VE] explained the method used to extrapolate from the production workers, referenced the DOT and the Occupational Information Network, and cited her own knowledge and experience. Also, [the VE] explained her methodology regarding a surveillance system monitor.

After the hearing, Hanson filed a VE Report of [a Social Security attorney] and requested that [the VE's] report be stricken as it was not based upon an adequate foundation. However, the ALJ referred to this report and observed that [the Social Security attorney] shared many of the criticisms raised by [Hanson's attorney] at the hearing. Based on this record, it was reasonable to rely on [the VE's] testimony that Hanson could perform a significant number of jobs in the economy.

Id. at 7 (citations to the administrative hearing record omitted).

While Hanson appealed the district court's decision to the Seventh Circuit, it does not appear that he appealed this portion of the decision, because the Seventh Circuit makes no reference to it. Because plaintiff Hanson already has received a district court ruling on whether his ALJ's reliance on the VE testimony was reasonable, and he has not appealed that ruling, it is not appropriate for this court to waive the exhaustion requirement for plaintiff Hanson.

In contrast, Margaret Ash had her first hearing six years ago; the complaint does not make clear how long it has been since the initial denial of benefits. She has twice asked ALJs to provide VE data—once before her district court appeal, the second time at the remand hearing after appeal. Both times,

49

she was denied the data, and at the time of the complaint, she again was before the Appeals Council. Ash argued to the district court that the "ALJ erred in refusing [her] request that the vocational expert's labor statistics be produced at the hearing . . . ." Ash v. Astrue, No. 11-cv-0900, 2012 WL 6115099 at *6 (E.D. Wis. Dec. 10, 2012). Because the Commissioner had not addressed that issue and because the court was remanding for consideration of the medical evidence, the court declined to address the VE data argument. Id. Plaintiff Ash, then, has attempted to raise the issue of the ALJ's refusal to provide VE data three different times, and so far, has not had either a hearing in which the ALJ has complied with the Seventh Circuit's requirements or an appellate determination that the ALJ did or did not comply with the Seventh Circuit's requirements.

More starkly, Marotti-Roxbury has been waiting for benefits for almost twelve years, has had multiple hearings and reviews, and received an explicit directive from the district court requiring a remand ALJ to conduct a fresh step five analysis based on *reliable* vocation evidence. Yet, at the remand hearing, despite requesting a subpoena almost two months before the hearing and asking the ALJ to notify counsel ahead of time if the subpoena request were overly broad or unduly burdensome, the plaintiff again went through a hearing without the benefit of the VE's data (or even the VE's presence), and was told she could obtain the data after the fact and get yet another hearing if she wanted to cross-examine on that data. To require Marotti-Roxbury to *continue*

50

exhausting her remedies after almost twelve years and an explicit directive from the district court seems the essence of futility.

Accordingly, the court will dismiss plaintiffs Mussleman, Dolezar and Hanson for failure to exhaust, but will waive the exhaustion requirement for plaintiffs Ash and Marotti-Roxbury. The court will deny the Commissioner's motion to dismiss Ash and Marotti-Roxbury.

### III. THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 13)

In their motion for a preliminary injunction, the plaintiffs ask the court to "enjoin the Commissioner from enforcing any policy against" granting claimants' "demands for the materials of vocational experts." Dkt. No. 14 at 25. For the reasons stated below, the court will deny the motion.

### A.    The Preliminary Injunction Standard

A preliminary injunction is a type of "equitable, interlocutory . . . relief" and "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." Girl Scouts of Manitou v. Girl Scouts, America, 549 F.3d 1079, 1085 (internal quotation marks and citations omitted). When a district court faces a request for a preliminary injunction, it must undertake "two distinct phases: a threshold phase and a balancing phase." Id. at 1085-86.

In the threshold phase, the moving party must show (1) "that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution;" (2) "that traditional legal remedies would be inadequate;" and (3) "that its claim has some likelihood of succeeding on the

51

merits." Id. at 1086 (internal citations omitted). A court must deny the injunction if the movant fails to meet any one of these requirements. If the movant satisfies each of the three prongs of the threshold phase, the court moves to the balancing analysis.

In the balancing phase, "the court . . . attempt[s] to minimize the cost of potential error," by "balanc[ing] the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." Id. (internal quotation marks and citation omitted). "Specifically, the court weighs the irreparable harm that the moving party would endure without . . . [an] injunction against any irreparable harm the nonmoving party would suffer if the court . . . grant[ed] such relief." Id. (citing Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir. 1992)). This is "a sliding scale approach." Id. "'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" Id. (quoting Roland Mach. Co. v. Dress Indus., Inc., 749 F.2d 380, 387 (7th Cir. 1984)). According to the Seventh Circuit, the "public interest" portion of this phase, requires the consideration of how a preliminary injunction, or the lack thereof, would affect nonparties. Id.

Overall, the test involves "a subjective evaluation of the . . . various factors," as well as "a personal, intuitive sense about the nature of the case." Id. (internal quotation marks and citations omitted). The court "sits as would a

chancellor in equity." <u>Stuller, Inc. v. Steak N Shake Enters., Inc.</u>, 695 F.3d 676, 678 (7th Cir. 2012).

      B.    <u>Analysis</u>

The court finds that the two remaining plaintiffs cannot meet the threshold requirements for a preliminary injunction. The court has waived the exhaustion requirements for these two plaintiffs. Thus, they will be able both to continue to pursue their administrative remedies, and pursue their substantive argument regarding the allegations of the clandestine policy in this court. More to the point, however, the plaintiffs have not demonstrated that traditional legal remedies are inadequate. The court is allowing the plaintiffs to proceed on their substantive claim in this court. Thus, they have the opportunity to prove that the Commissioner has the clandestine policy they allege. The request for a preliminary injunction assumes that a clandestine policy exists and that the Commissioner is enforcing it, and asks this court to make that same assumption by enjoining the Commissioner from enforcing a policy that has not yet been proven to exist. The court will not bypass the litigation process in that manner. The court will deny the motion for a preliminary injunction.

## IV.   **THE PLAINTIFFS' MOTION TO CERTIFY CLASS (DKT. NO. 9)**

On March 17, 2015, the plaintiffs filed a motion for class certification under Fed. R. Civ. P. 23(b)(2). Dkt. No. 9. Rule 23(b)(2) contemplates a class action when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole."

Rule 23(a) sets forth the prerequisites for a class:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).

The court has dismissed thirty-three of the thirty-five named plaintiffs. The court anticipates that its decision above as to which plaintiffs may proceed despite their failure to exhaust remedies may inform how the plaintiffs seek to define the class (and may lead to the filing of an amended motion to certify). Because of the nature of the administrative process, the group of people who may qualify as putative class members given the court's conclusions above changes with each day that passes. It is, therefore, premature for the court to rule on a motion to certify a class. Instead, the court will defer ruling on the class certification motion until such time as it sets a deadline for joinder of parties.

The court notes that in 2011, the Seventh Circuit recommended that "[c]lass-action plaintiffs . . . move to certify the class at the same time that they

file their complaint," in order to "protect[] a putative class from attempts to buy off the named plaintiffs." Damasco v. Clearwire Corp., 662 F.3d 891, 896 (citation omitted). This prevented an action from becoming "moot" when a defendant made an offer of relief to the plaintiff prior to the filing of a motion for class certification. However, in August of 2015, the Seventh Circuit overruled Damasco. Chapman v. First Index, Inc., 896 F.3d 783, 787 (7th Cir. 2015). ("We overrule Damasco . . . to the extent [it] hold[s] that a defendant's offer of full compensation moots the litigation or otherwise ends the Article III case or controversy."). Therefore the court's refusal to decide this motion now should not prejudice the plaintiffs or impact an amended motion to certify the class.

## V. THE PLAINTIFFS' MOTION TO AMEND THE COMPLAINT (DKT. NO. 29)

On December 8, 2015, the plaintiffs filed a motion to file an amended complaint. Dkt. No. 29. The plaintiffs attached to that motion a proposed amended complaint. Dkt. No. 29-1.

Under Fed. R. Civ. P. 15(a)(1), a party may amend a pleading one time as a matter of course within twenty-one days of serving the pleading, or within twenty-one days after service of a responsive pleading or a motion under Rules 12(b), (3), or (f), "whichever is earlier." The plaintiffs filed their complaint on February 5, 2015 (Dkt. No. 1); the Commissioner filed the motion to dismiss on April 17, 2015 (Dkt. No. 19). Using either of those dates, the December 8, 2015 attempt to amend the complaint came too late to constitute the plaintiffs' one "matter of course" amendment.

55

Rule 15(a)(2) provides that, once the "matter of course" deadline has passed, "a party may amend its pleadings only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The defendant has not consented to the plaintiffs' request, leaving it to the court's discretion whether to grant leave to amend at this stage.

The Commissioner urges the court not to rule on the motion to amend until it has ruled on the other motions the plaintiffs have filed. The court now has ruled on the other motions.

"The Federal Rules of Civil Procedure adopt a liberal standard for amending," and "[t]he Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." Life Plans, Inc. v. Sec. Life of Denver Ins. Co., 800 F.3d 343, 357-58 (7th Cir. 2015) (citing Foman v. Davis, 371 U.S. 178, 182 (1862)).

The plaintiff seeks to amend the complaint to remove plaintiffs whose claims have been mooted by the administrative process and to add plaintiffs who allegedly have now been harmed by the alleged policy of the Commissioner. The court cannot find "futility, undue delay, undue prejudice, or bad faith" on the part of the plaintiffs in this case. Id. The current decision, however, likely will impact whether the plaintiffs wish to proceed on the proposed amended complaint (Dkt. No. 29-1), or file a second amended complaint. Within thirty days from the date of this order, the plaintiffs must

56

either inform the court that they wish the court to docket the proposed amended complaint as the operative complaint in the case, Dkt. No. 29-1, or file a second amended complaint.

## VI. CONCLUSION

The court **GRANTS IN PART AND DENIES IN PART** the Social Security Commissioner's motion to dismiss (Dkt. No. 19). The court **ORDERS** that the complaint is **DISMISSED** as to all named plaintiffs *except* **Margaret Ash** and **Diane Marotti-Roxbury**.

The court **DENIES** the plaintiffs' motion for a preliminary injunction (Dkt. No. 13). The court **STAYS** ruling on the motion for class certification (Dkt. NO. 9).

The court **GRANTS** the plaintiffs' motion to amend the complaint (Dkt. No. 29), and **ORDERS** that **WITHIN THIRTY (30) DAYS OF THE DATE OF THIS ORDER**, the plaintiffs either shall inform the court that they wish it to docket the proposed amended complaint at Dkt. No. 29-1, or file a second amended complaint. Once the plaintiffs have elected one of those options, the court will schedule a Rule 16 conference and require the parties to file a Rule 26(f) report.

Dated in Milwaukee, Wisconsin this 28th day of March, 2016.

BY THE COURT:

_____

HON. PAMELA PEPPER
United States District Judge

57